# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

GEORGE CYLE WILLIAMSON, JR.,
      Petitioner,

v.                                  Case No. 8:19-cv-3154-KKM-AEP

SECRETARY, DEPARTMENT
OF CORRECTIONS,
      Respondent.

_____

# ORDER

George Cyle Williamson Jr., a Florida prisoner, timely[1] filed a pro se Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 challenging his state court conviction based on an alleged error of the trial court and alleged failures of his trial counsel. (Doc. 1.) Having considered the petition, (*id.*), Williamson's memorandum of law, (Doc. 2), the response in opposition, (Doc. 10), and Williamson's reply and supplemental

---

[1] A state prisoner has one year from the date his judgment becomes final to file a § 2254 petition. *See* § 2244(d)(1). This one-year limitation period is tolled during the pendency of a properly filed state motion seeking collateral relief. *See* § 2244(d)(2). The state appellate court affirmed Williamson's conviction and sentence on October 19, 2016. (Doc. 10-3, Ex. 14.) His judgment became final 90 days later, on January 17, 2017, when the time to petition the Supreme Court of the United States for a writ of certiorari expired. *See Bond v. Moore*, 309 F.3d 770, 774 (11th Cir. 2002). After 149 days of untolled time, Williamson filed a petition alleging ineffective assistance of appellate counsel on June 16, 2017. (*Id.*, Ex. 17.) The petition was denied on July 25, 2017. (*Id.*, Ex. 18.) Fourteen days later, on August 9, 2017, Williamson filed his motion for postconviction relief. (*Id.*, Ex. 19.) That motion remained pending until the mandate issued on November 19, 2019. (*Id.*, Ex. 28.) After another 30 days, Williamson filed his § 2254 petition on December 20, 2019. A total of 193 days of untolled time elapsed after his state judgment became final. Williamson's petition is therefore timely.

documentation, (Docs. 13-1 & 17), the Court denies the petition. Furthermore, a certificate of appealability is not warranted.

## I.   BACKGROUND

### A. Procedural History

A state court jury convicted Williamson of manslaughter with a weapon. (Doc. 10-2, Ex. 5.) The state trial court sentenced him to 25 years in prison. (*Id.*, Ex. 8.) The state appellate court per curiam affirmed the conviction and sentence. (Doc. 10-3, Ex. 14.) Williamson unsuccessfully moved for postconviction relief under Florida Rule of Criminal Procedure 3.850. (*Id.*, Exs. 19 & 20.) The state appellate court per curiam affirmed the state postconviction court's denial of relief. (*Id.*, Ex. 25.)

### B. Factual Background

On January 24, 2014, Williamson called his friend Willie Jones and asked Jones to bring vodka, cranberry juice, and ice to Williamson's home in Palmetto, Florida. Security cameras filmed Jones purchasing the items at a Walmart in Palmetto. (Doc. 10-2, Ex. 4, pp. 354-56, 362.)[2]

---

[2] The exact time of Jones's arrival is not clear. Williamson recalled Jones arriving around 5:00-6:00 p.m. (Doc. 10-2, Ex. 4, pp. 369, 618.) Phone records showed that Williamson and Jones last had phone contact at around 6:40 p.m. (*Id.*, pp. 502, 506.) Williamson's brother Peter lived in a different building on the same property. Peter went out to dinner that night and observed Jones's truck on the property when he returned at around 9:00 p.m. (*Id.*, pp. 310-11.)

Around 10:15 p.m., Williamson called 911 and said that he believed Jones had "expired." (*Id.*, pp. 320, 323.) He said that Jones had fallen to the floor, was not breathing, and was not awake. (*Id.*, pp. 323-24.) The 911 operator told Williamson to unlock the door and turn on the outdoor light, and Williamson replied, "Okay. Okay. Do you know where I am?" (*Id.*, p. 325.) The operator gave Williamson instructions for performing chest compressions on Jones. (*Id.*, pp. 326-31.)

Two firefighters, Donald Bunch and Joe Sicking, arrived. They had been informed that the situation involved cardiac arrest and performed CPR on Jones. (*Id.*, pp. 221, 247-48, 280-81.) Jones was lying on his back with his head in the kitchen and his feet in a hallway of the dimly-lit house, towards the living room. (*Id.*, pp. 223, 336, 407.) Bunch observed that Jones had no pulse but felt warm, which led Bunch to believe that Jones had not "been down" for long. (*Id.*, pp. 223, 226.)

When EMS personnel arrived, they took over CPR. The firefighters and paramedics asked Williamson what happened to Jones. Williamson told Bunch that he was not sure, but that Jones said he felt like he was going to pass out and then fell. (*Id.*, p. 225.) Williamson made "different and varying" statements to Sicking as to whether he saw Jones fall and how long Jones had been on the ground. (*Id.*, p. 275.) Williamson told paramedic Scott Caprio that Jones "had a heart attack or something to that effect." (*Id.*, p. 299.)

3

Sometime after EMS arrived, Bunch noticed a dark spot on the floor. (*Id.*, pp. 229-30.) With the aid of a flashlight, Bunch saw that it was a large pool of blood. (*Id.*, p. 230.) Responders moved Jones onto his side and found a hole in his triceps area. (*Id.*, p. 230.) Caprio found a significant amount of coagulated blood in Jones's airway. (*Id.*, p. 300.) After continuing CPR, responders eventually called a hospital and received a doctor's order to cease their efforts. (*Id.*, pp. 293, 302.) At some point, paramedics told Williamson to wait outside the house. (*Id.*, p. 245.)

Police began arriving. Deputy Rodney Norris observed Williamson outside in socks without shoes. (*Id.*, p. 336-37.) He saw blood on one of Williamson's socks, and Williamson said he had injured his foot. (*Id.*) Deputy Donald Mays saw vodka, cranberry juice, and ice on the kitchen counter. (*Id.*, p. 369.) Another bottle of vodka was in a trash can. (*Id.*, pp. 444-45.) Williamson told both Deputy Norris and Deputy Mays that he did not know what happened to Jones. (*Id.*, pp. 337, 368.)

Williamson also talked to his brother Peter that night. (*Id.*, pp. 311-12.) When Peter asked what happened, Williamson told him that Jones fell down after getting up to make drinks but that Williamson did not know what was wrong. (*Id.*, p. 312.) Williamson told Peter that Jones was cold to the touch. (*Id.*, p. 312.)

Deputy Mays sat outside the house with Williamson. When Deputy Mays asked if anyone else was there, Williamson told him that no one else had come to the property.

4

(*Id.*, p. 369.) Deputy Mays did not find anyone else in the home, and during the eight hours he spent responding to the incident, he did not learn of anyone other than Williamson and Jones being in the home. (*Id.*, p. 366.) Williamson also told Deputy Mays that he poured himself a drink and went and watched TV. (*Id.*, p. 370.) Williamson stated that he did not hear or see anything, and that he happened to walk out and see Jones on the floor. (*Id.*, p. 370.) After a while Williamson and Deputy Mays moved into Detective Mays's police car. (*Id.*, p. 371.) They did so both because the house was now a crime scene and because it was cold outside and the police car was heated. (*Id.*) Williamson was not handcuffed in the police car. (*Id.*, pp. 371-72.) Williamson was free to leave the police car, and he did so more than once to stretch his legs. (*Id.*, pp. 371-72.)

Crime scene technician Hurley Smith found a Taurus Judge shotgun on a desk in the living room. (*Id.*, pp. 407-08, 411.) Blood was found on the floor close to the desk. (*Id.*, pp. 410-11.) Smith found a spent shell casing underneath the hammer of the Taurus; he explained that the shell casings stay inside this kind of firearm when it is fired. (*Id.*, p. 408.) Wadding keeps the pellets together in the shotgun shell, but once the gun is fired, the wadding is expelled and falls. (*Id.*, p. 409.) Wadding consistent with a .410 shotgun shell was recovered from the hallway between Jones's body and the living room. (*Id.*, pp. 409-10, 429, 445.) Smith collected .410 ammunition from the home, including .410 live rounds from inside the Taurus. (*Id.*, pp. 423-24, 428.)

Williamson agreed to be transported to a police operation center. (*Id.*, p. 601.) Deputy Mays drove Williamson to the center and brought him to an interview room. (*Id.*, p. 373.) Williamson still was not handcuffed. (*Id.*, p. 374.) At the operation center, Williamson had a recorded conversation with Deputy Mays. Williamson stated that Jones was healthy and asked if police thought someone did something to Jones. (*Id.*, p. 611.) Williamson asked what would cause a hole in Jones's arm and noted that Jones did not say anything about having contact or conflict with anyone earlier. (*Id.*, p. 611.) Williamson stated that he knew Jones did not "have a pass out thing" because he did not hear Jones fall on the floor. (*Id.*, p. 612.) Williamson stated that he was watching TV and then saw Jones lying on the floor. (*Id.*, p. 612.) He stated that he did not hear any gunshots but that he was "very acute with gunshots 'cause [he's] a gun freak." (*Id.*, p. 612.) Williamson stated that no one shot Jones and it was as if Jones just lied down on the floor. (*Id.*, p. 612.)

Williamson stated that Jones was his close friend and he did not know what happened. (*Id.*, pp. 612-13.) He suggested that maybe Jones's blood pressure went down or his heart "was giving out" on him. (*Id.*, p. 613.) He denied that anyone attacked Jones in the house because Jones was big and "a normal man couldn't face him toe-to-toe." (*Id.*, p. 613.) Williamson also stated that he did not know what kind of hole police were referring to and that "maybe a nurse fed him something." (*Id.*, p. 614) Williamson stated that he did not believe Jones died a violent death and that he thought Jones lied down and died of a

broken heart because his granddaughter had not contacted him over the holidays. (*Id.*, pp. 614-15.) He stated that he touched Jones's check and he was already cold. (*Id.*, p. 615.)

Detectives Bliss and Dickerman then conducted a recorded interview. At the outset, they informed Williamson he was not under arrest, that they were trying to get the facts in the death investigation, that the door was not locked, and that Williamson was free to leave. (*Id.*, pp. 617-18.) During the interview, Williamson gave consent to search his home. (*Id.*, pp. 604, 643-44.)

Williamson told the detectives that he made himself a drink, went to the living room, and that the next thing he knew, he came out and Jones was lying in the hallway. (*Id.*, p. 620.) Williamson stated that he went to the living room by himself and was watching a TV show. (*Id.*, p. 623.) He stated that he watched TV for just a minute, went back out, and saw Jones lying on the floor. (*Id.*, p. 624.) Williamson said it happened so quickly he never had a chance to pay Jones for the items he bought. (*Id.*, pp. 626-27.)

Williamson believed Jones arrived around 6:00 p.m. and recalled that the incident occurred a short time later. (*Id.*, p. 618.) In this version of events, about four hours would have passed before Williamson called 911 at approximately 10:15 p.m. Williamson stated that he was not certain what happened over the course of four hours but guessed that he must have been trying to resuscitate Jones during that time. (*Id.*, pp. 628-29, 637.) He expressed confusion as to why he would have waited so long to call 911 and agreed that it

was possible that he blacked out. (*Id.*, pp. 637-38, 646.) He stated that he did not hear gunshots, did not hear Jones argue with anyone, and did not hear Jones complain about any medical issues. (*Id.*, p. 629.) At one point he indicated that Jones might have been poisoned. (*Id.*, p. 645.)

Williamson stated that he owned about 20 guns and that he always kept a gun in his pocket. (*Id.*, pp. 630-31.) He denied that he could have accidentally hurt Jones and stated that he had not fired a gun in six months. (*Id.*, pp. 631-32.) Williamson stated that after Jones arrived, Williamson locked the door behind him and no one else was there. (*Id.*, p. 632.) The door was still closed when he found Jones on the floor but was unsure whether it was still locked. (*Id.*, p. 633.) Williamson agreed that he might have unlocked the door in anticipation of responders arriving. (*Id.*, p. 633.)

Williamson indicated that Jones was hurt before he arrived, suggesting that a woman whom Williamson heard in the background during a phone call with Jones could be responsible. (*Id.*, pp. 634-35.) He denied that the shooting occurred in his house. (*Id.*, pp. 635-36.) When asked what should happen to the person who shot Jones, Williamson replied, "See, because, well, I don't know, maybe that person might not have thought that Willie would go down and die if, you know, knowing what a great big huge person Willie was, if they were to shoot him. You know." (*Id.*, p. 635.)

Williamson stated that a person he knew, Victor Pompey, had stolen guns and money from Williamson but that Pompey had been in jail for a while on a kidnapping charge. (*Id.*, p. 640-42.) In setting out the day's events, Williamson stated that his ex-wife and her son came by the house earlier. (*Id.*, p. 640.)

After about an hour and a half, Deputy Mays brought Williamson back to the residence. (*Id.*, pp. 375, 385.) They stayed in the car; Williamson was not restrained and was free to get out of the car. (*Id.*, p. 376.) Williamson became agitated about the search, which was continuing inside the home. (*Id.*, p. 376.) Williamson then stated that he should have "buried the bitch" in the backyard. (*Id.*, p. 377.) Williamson said that if he knew it would be "like this," he would have dragged Jones outside and let the raccoons eat him. (*Id.*, p. 377.) Observing officers inside his home during the search, Williamson complained about a "mf'er" leaning on his counters. (*Id.*, p. 387.) Williamson also told Deputy Mays that police made it difficult to be honest with them. (*Id.*, p. 377.)

Deputy Mays also noticed that Williamson was tearing up and was remorseful that Jones had died. (*Id.*, pp. 377, 385.) After Williamson's comments, which Deputy Mays believed were made while Williamson was frustrated and wanted to go to sleep, Williamson revoked consent for the search. (*Id.*, pp. 378, 387-88.) Police obtained a warrant and continued the search. (*Id.*, 609.) Deputy Mays transported Williamson back to the police operation center. (*Id.*, p. 378.)

Suzanne Utley, the assistant medical examiner, noted that the gunshot wound was to the back of Jones's arm. (*Id.*, p. 571.) She found one large perforation and multiple small perforations from individual pellets. (*Id.*, 571.) Dr. Utley found that one pellet perforated Jones's right lung and the soft tissue in the center of his body. (*Id.*, p. 573.) This caused massive internal bleeding in Jones's chest cavity that would have eventually rendered him unable to breathe. (*Id.*, p. 574-75.)

DNA from the grip of the Taurus matched Williamson's DNA; it was possible that there was another contributor, but the other DNA sample was not suitable for comparison. (*Id.*, pp. 550, 554-55.) DNA testing showed that Jones was the major contributor to blood found on Williamson's sock. (*Id.*, pp. 549-50.)

## II.    STANDARD OF REVIEW UNDER SECTION 2254

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief under the AEDPA can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "The power of the federal courts to grant a writ of habeas corpus setting aside a state prisoner's conviction on a claim that his conviction was obtained in violation of the United States Constitution is strictly circumscribed." *Green v. Sec'y, Dep't of Corr.*, 28 F.4th 1089, 1093 (11th Cir. 2022).

Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of § 2254(d)(1), the phrase "clearly established Federal law" encompasses the holdings only of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). This section "defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court." *Id.* at 404. First, a decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.* at 413.

Second, a decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the

prisoner's case." *Id.* The AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694. As a result, to obtain relief under the AEDPA, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (stating that "[t]he state court's application of clearly established federal law must be objectively unreasonable" for a federal habeas petitioner to prevail and that the state court's "clear error" is insufficient).

When the last state court to decide a federal claim explains its decision in a reasoned opinion, a federal habeas court reviews the specific reasons as stated in the opinion and defers to those reasons if they are reasonable. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). But the habeas court is "not limited by the particular justifications the state court provided for its reasons, and [it] may consider additional rationales that support the state court's determination." *Jennings v. Secretary, Fla. Dep't of Corr.*, 55 F.4th 1277, 1292 (11th Cir. 2022). When the relevant state-court decision is not accompanied with reasons

for the decision—such as a summary affirmance without discussion—the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." *Wilson*, 138 S. Ct. at 1192. The state may "rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision . . . ." *Id.*

For purposes of § 2254(d)(2), "it is not enough to show that 'reasonable minds reviewing the record might disagree about the finding in question.'" *Brown v. Davenport*, 142 S. Ct. 1510, 1525 (2022) (quotations omitted). "An unreasonable determination of the facts occurs when the direction of the evidence, viewed cumulatively, was too powerful to conclude anything but the petitioners factual claim." *Teasley v. Warden, Macon State Prison*, 978 F.3d 1349, 1355 (11th Cir. 2020) (internal quotation marks and alterations omitted). A state court's findings of fact are presumed correct, and a petitioner can rebut the presumption of correctness afforded to a state court's factual findings only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Even where a petitioner succeeds in rebutting the presumption, he must show that the state court's decision is "based on" the incorrect factual determination. *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1035 (11th Cir. 2022). This is because a state court decision may still be reasonable "even if some of the state court's individual factual findings

13

were erroneous—so long as the decision, taken as a whole, doesn't constitute an 'unreasonable determination of the facts' and isn't 'based on' any such determination." *Id.* (quoting *Hayes v. Sec'y, Fla. Dep't of Corr.*, 10 F.4th 1203, 1224–25 (11th Cir. 2021) (Newsom, J., concurring)).

In addition to satisfying the deferential standard of federal court review of a state court adjudication, a federal habeas petitioner must exhaust his claims by raising them in state court before presenting them in a federal petition. *See* 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). A petitioner satisfies this exhaustion requirement if he fairly presents the claim in each appropriate state court and alerts that court to the federal nature of the claim. *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). A petitioner shows cause for a procedural default when he demonstrates "that some objective factor external to the defense impeded the effort to raise the claim properly in the state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). A petitioner

demonstrates prejudice by showing that "there is at least a reasonable probability that the result of the proceeding would have been different" absent the constitutional violation. *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). "A 'fundamental miscarriage of justice' occurs in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent." *Id.*

## III.   INEFFECTIVE ASSISTANCE OF COUNSEL

Williamson brings several claims for ineffective assistance of trial counsel under the Sixth Amendment. Under the well-known, two-part standard articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), to succeed, he must show both deficient performance by his counsel and prejudice resulting from those errors. *Id.* at 687.

The first part "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* The lynchpin of this analysis is whether counsel's conduct "was reasonable considering all the circumstances." *Id.* at 688. A petitioner establishes deficient performance if "the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id.* at 690. A court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

15

The second part requires showing that the deficient performance prejudiced the defense. *Id.* at 687. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. To demonstrate prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

"The question [on federal habeas review of an ineffective assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.' " *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). Consequently, federal petitioners rarely prevail on claims of ineffective assistance of counsel because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (quotation and citations omitted).

## IV.   ANALYSIS

### A. Ground One

Williamson argues that the state trial court erred in denying his motion for judgment of acquittal because the State presented insufficient evidence that he was the shooter. Williamson alleges violations of his Fifth and Fourteenth Amendment rights.

Respondent correctly contends that Williamson's claim is unexhausted because he did not fairly present the federal nature of the claim on appeal. Williamson's appellate brief relied on Florida's unique standard of review for circumstantial evidence cases. (Doc. 10-2, Ex. 11, pp. 18-27.) Florida's standard provides that "[w]here the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence." *Preston v. Sec'y, Fla. Dep't of Corr.*, 785 F.3d 449, 460 (11th Cir. 2015) (quoting *Thorp v. State*, 777 So.2d 385, 389 (Fla. 2000)). Florida's standard for circumstantial evidence cases "differs greatly" from the federal standard of review. *Preston*, 785 F.3d at 460.[3] The federal standard, articulated in *Jackson v. Virginia*, asks whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. 443 U.S. 307, 319 (1979).

---

[3] Florida has since eliminated its distinct standard of review in circumstantial evidence cases and now follows the federal standard in all cases. *Bush v. State*, 295 So.3d 179 (Fla. 2020). But the special circumstantial evidence standard governed at the time of Williamson's trial and direct appeal.

Williamson's brief asserted, without elaboration, that the trial court violated his federal right to due process under the Fifth and Fourteenth Amendments. (Doc. 10-2, Ex. 11, p. 20.) This perfunctory reference to constitutional rights did not exhaust a federal due process claim. In *Baldwin v. Reese*, the Supreme Court of the United States stated that a petitioner can "indicate the federal law basis for his claim" by citing the federal source of law in conjunction with the state law claim, citing a case deciding such a claim on federal grounds, or simply labeling the claim as "federal." 541 U.S. 27, 32 (2004). The Eleventh Circuit Court of Appeals has determined that this language was dicta and has held that more than a cursory reference to federal law is necessary to fairly present a federal claim:

> If read in a vacuum, this dicta might be thought to create a low floor indeed for petitions seeking to establish exhaustion. However, we agree with the district court that this language must be "applied with common sense and in light of the purpose underlying the exhaustion requirement[:] 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.'" *McNair* [*v. Campbell*], 315 F.Supp.2d [1179,] 1184 [(M.D. Ala. Apr. 29, 2004)] (quoting *Vasquez v. Hillery*, 474 U.S. 254, 257, 106 S.Ct. 617, 620, 88 L.Ed.2d 598 (1986)). This is consistent with settled law established by the Supreme Court. *See Picard* [*v. Connor*], 404 U.S. [270,] 275, 92 S.Ct. [509,] 512 [(1971)] ("We emphasize that the federal claim must be fairly presented to the state courts."). We therefore hold that " '[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.' " *Kelley* [*v. Sec'y for Dep't of Corr.*], 377

> F.3d [1317,] 1345 [(11th Cir. 2004)] (quoting *Martens v. Shannon*, 836
> F.2d 715, 717 (1st Cir. 1988)).

*Campbell v. McNair*, 416 F.3d 1291, 1302-03 (11th Cir. 2005).

Williamson's minimal reference to his federal right to due process, without more, was insufficient to alert the state court that he intended for it to review a federal claim. *See id.*; *see also Ramos v. Sec'y, Dep't of Corr.*, 441 F. App'x 689, 696-97 (11th Cir. 2011) (stating that a petitioner failed to exhaust a federal claim when he only "made one passing reference" to his federal constitutional rights to due process and a fair trial, without arguing federal standards or citing federal case law).

Williamson failed to satisfy the exhaustion requirement. He cannot return to state court to present the federal claim in a second direct appeal. *See* Fla. R. App. P. 9.140(b)(3) (stating that a notice of appeal must be filed within 30 days of the rendition of sentence). Therefore, Williamson's claim is procedurally defaulted. *See Smith*, 256 F.3d at 1138. Williamson does not show that an exception applies to overcome the default. *See id.* Ground One is barred from federal habeas review and affords Williamson no relief.

## B. Ground Two

Williamson asserts that trial counsel was ineffective for failing to move to suppress statements he made in custody without the benefit of warnings under *Miranda v. Arizona*, 384 U.S. 436 (1966). Williamson's claim involves the statements he made to Detectives

Bliss and Dickerman at the police operation center. Williamson agrees that he consented to being transported to the operation center to make a statement. But he alleges that his chair in the interview room was bolted to the ground and the detectives blocked his path to the door, despite having told him he was free to leave. He also alleges that he did not have his dentures or eyeglasses and was only wearing a bathrobe and socks. Williamson states that while the interview "began innocently enough," the detectives' goal was "to elicit a confession or an incriminating statement from" him. (Doc. 1, p. 7.) He asserts that detectives presented him with evidence of guilt and "provided him with hypothetical scenarios under which he could have shot his friend to see if he would agree." (*Id.*)

Williamson asserts that a reasonable person would not have felt free to leave and would have believed he was in custody. Williamson contends that he was prejudiced by counsel's failure because, even though he did not admit guilt, "his apparent confusion as to what had occurred and the timeline of the day's events [that he gave in his statement] was capitalized upon by the prosecution to add to the suspicious circumstances that led to his conviction absent direct evidence of his guilt." (*Id.*)

In denying Williamson's claim, the state postconviction court found that police were not required to provide warnings because Williamson was not in custody for *Miranda* purposes. The state court recognized Williamson's acknowledgment that he went to the interview voluntarily. (Doc. 10-3, Ex. 20, pp. 4-5.) The state court also noted that

Williamson was not handcuffed and was advised that he could leave at any time. (*Id.*, p. 5.) The state court found that nothing obstructed Williamson from leaving. (*Id.*) The state court pointed out that Williamson was in the interview room for approximately one hour and that he was brought back to his home, where he continued to observe the search, about an hour and a half after he left. (*Id.*)

The state court rejected Williamson's assertion that the detectives' tactics during the interview rendered him in custody. The state court found that the transcript of the recording did not indicate aggressive confrontation. (*Id.*, pp. 5-6.) Rather, the state court found, it showed that detectives at times repeated questions or asked "pointed" questions to try to establish a timeline. (*Id.*) The state court found that the questioning was intended to clarify Williamson's version of events, not to get him to make incriminating statements or to change his story. (*Id.*, p. 6.)

The state court concluded that Williamson's freedom of movement was not limited and that a reasonable person would have felt free to terminate the conversation and leave. (*Id.*, pp. 5-6.) The state court found that even though Williamson was advised he could leave at any time, he made himself available to police and agreed to talk. (*Id.*, p. 5.) The state court determined that under the totality of the circumstances, Williamson was not in custody for *Miranda* purposes and that the interrogation did not amount to a custodial interrogation. (*Id.*, pp. 5-6.) The state court therefore concluded that counsel was not

21

ineffective for failing to pursue a meritless motion to suppress Williamson's statements. (*Id.*, p. 6.)

Williamson fails to establish that the state court unreasonably denied his claim. *Miranda* holds that, under the Fifth Amendment, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444. Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.*; *see also Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) ("*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'").

To determine whether a suspect was in custody, a court considers the totality of the circumstances surrounding the interrogation. *Stansbury v. California*, 511 U.S. 318, 322 (1994). A court considers "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (footnote omitted); *see also United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996) (stating that whether a suspect was in custody and thus

22

entitled to *Miranda* warnings depends on "whether under the totality of the circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of movement . . . to such extent that he would not feel free to leave") (internal quotation marks and citation omitted). "The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." *Moya*, 74 F.3d at 1119. "[U]under the objective standard, the reasonable person from whose perspective 'custody' is defined is a reasonable innocent person." *Id.*

In connection with the freedom of movement inquiry, a court must also ask whether the circumstances of the interview "present[ ] the same inherently coercive pressures as the type of station house questioning in *Miranda*." *Howes v. Fields*, 565 U.S. 499, 509 (2012); *see also United States v. Luna-Encinas*, 603 F.3d 876, 882 (11th Cir. 2010) (explaining that a court must consider whether the police encounter involved a "highly intrusive coercive atmosphere that may require *Miranda* warnings even before a formal arrest is made") (internal quotation marks and citation omitted).

The state court's decision was not unreasonable. The record supports the conclusion that Williamson was not in custody. Williamson, who was never restrained, voluntarily went to the operation center and readily spoke with detectives. There was evidence that the detectives did not block his path to the door during the interview. Detective Bliss testified that the door to the interview room was to Williamson's right, that detectives

made no effort to block him, and that he could have stood up and left. (Doc. 10-2, Ex. 4, p. 657.) The interview lasted for about an hour, and Williamson was taken home afterwards. Considering the totality of these circumstances, Williamson fails to demonstrate that a reasonable innocent person would not have felt free to terminate the interview. *See Thompson*, 516 U.S. at 112; *Moya*, 74 F.3d at 1119.

Further, Williamson does not show that any other aspect of the interview was so coercive as to transform it into a custodial interrogation. As the state court noted, the detectives repeatedly asked Williamson about the timeline of events. (*See* Doc. 10-2, Ex. 4, pp. 621-29, 636-38, 646.) The state court did not unreasonably conclude that such questioning was intended to clarify Williamson's remarks, rather than to press him into making incriminating statements. Williamson could not account for the time between Jones's arrival and the 911 call (a span of approximately four hours). Williamson at times indicated he must have been performing CPR for hours but also said he did not know what happened and that it was possible he blacked out. (*Id.*, pp. 627-29, 637-38, 646-47.) When detectives appeared ready to conclude the interview, Williamson instead continued the discussion, reiterating that he did not know what happened before he called 911. (*Id.*, p. 646.) Williamson talked about finding Jones and performing chest compressions, but repeated that he was uncertain about what occurred and was "not really sure of what I did." (*Id.*, pp. 646-47.)

And while Williamson states that detectives brought up possible scenarios by asking him whether he could have accidentally harmed Jones, he does not show that such questioning was so coercive as to render him in custody. In the light of Williamson's conflicting statements and repeated assertions that he was uncertain what occurred, the state court reasonably concluded that the detectives' questioning reflected an attempt to clarify Williamson's statements rather than an attempt to obtain incriminating information. Williamson does not establish that detectives created a coercive atmosphere such that he was effectively in custody and thus entitled to *Miranda* warnings. *See Howes* 565 U.S. at 509; *Luna-Encinas*, 603 F.3d at 882.

Under the circumstances, Williamson fails to show that the state court unreasonably concluded that he was not required to receive *Miranda* warnings because he was not subject to custodial interrogation or its equivalent. Thus, he cannot show that the state court unreasonably applied *Strickland* in finding that trial counsel was not ineffective by forgoing a motion to suppress his statements. *See Freeman v. Att'y Gen.*, 536 F.3d 1225, 1233 (11th Cir. 2008) (stating that an attorney "cannot be deficient for failing to raise a meritless claim"). Because Williamson does not show that the state court's decision involved an unreasonable application of *Strickland* or was based on an unreasonable factual determination, he is not entitled to relief on Ground Two.

25

## C. Ground Three

Williamson contends that trial counsel was ineffective for failing to investigate an earlier burglary at his home during which the perpetrator stole two Taurus Judge firearms—the same type of firearm as that recovered on the night of the shooting. Williamson theorizes that "the perpetrator or perpetrators of the first burglary returned for a second trip armed with one of the stolen Judge revolvers and shot Mr. Jones during their attempt." (Doc. 1, p. 9.) He claims that if counsel had "presented this evidence together with his reasonable hypothesis of the returning burglar(s), a reasonable probability exists that the outcome of the trial would have been different." (*Id.*)

Williamson states that police determined Jones was shot with a .410 shotgun shell and that the recovered Taurus had a spent shell under the hammer of the gun. (*Id.*, p. 8.) But Williamson contends that police failed to test the Taurus to see if it was operable or had been fired recently. He also alleges that he told counsel about the burglary in which the two Taurus revolvers were stolen and that he always kept an empty shell in the chamber of his remaining Taurus because it lacked a "half-cock safety feature." (*Id.*) Williamson argues that he could have testified to this information.[4]

---

[4] To the extent Williamson intends to raise a distinct claim that trial counsel was ineffective for not calling him to testify in order to develop a defense, his claim is addressed in Ground Four, *infra*.

The state court denied Williamson's claim, finding that his factual allegations did not establish a reasonable hypothesis of innocence. The state court noted that a Taurus Judge firearm was found in Williamson's home with an empty cartridge in the chamber, and that police recovered wadding from the cartridge on the floor between Jones's body and the Taurus's location. (Doc. 10-3, Ex. 20, p. 7.) The state court also noted that Williamson agreed that he locked the door after Jones arrived and that Williamson was then alone with Jones. (*Id.*, pp. 7-8.) The state court concluded that the record was devoid of indications of forced entry or missing items. (*Id.*, p. 8.)

The state court also pointed out that a person named Victor Pompey who previously stole firearms from Williamson was in prison and that Williamson had not seen Pompey in months. (*Id.*)[5] The postconviction court stated that the prosecution rebutted Williamson's reasonable hypotheses of innocence at trial by presenting competent evidence inconsistent with his theory that an unknown perpetrator entered his locked home, shot the victim with the same model of gun that he owned, and left without Williamson noticing, all in what Williamson told police was a short period of time. (*Id.*) The state court concluded that in the light of the evidence presented, as well as Williamson's inconsistent

---

[5] Williamson now claims in his reply that Pompey was responsible for even earlier burglaries, not for the burglary in question. (Doc. 17, p. 12.) But in his statement to police, upon which the state court relied, Williamson identified Pompey as a person who stole from him in the past, and he did not state that another unknown person was also responsible for stealing guns from him. (Doc. 10-2, Ex. 4, pp. 640-42.)

statements about the events, he was not prejudiced by counsel's failure to investigate the burglary. (*Id.*)

Williamson has not shown that the state court's decision was unreasonable. The State presented significant circumstantial evidence that Williamson was the perpetrator. And as the state court indicated, Williamson's description of events in his statement to police is inconsistent with the narrative he now presents. In particular, Williamson maintained to police that no one came into his home, that Jones was not injured in his home, and that he would have heard any gunshots. (Doc. 10-2, Ex. 4, pp. 612, 632, 634-36.) Further, Williamson told police that he locked the door after Jones came inside, and his statements suggested that he unlocked the door for the responders. Although his statements were somewhat ambiguous, Williamson never indicated on the 911 call or in his statement to police that the door was already unlocked when he went to the door per the 911 operator's instruction, or that there had been a break-in.[6]

---

[6] In his statement to police, Williamson stated that he locked the door after Jones arrived. (Doc. 10-2, Ex. 4, p. 632.) Williamson stated that the door was closed when he found Jones but could not say for certain when the door had been unlocked:

> [Q] And when you came out and found him, was the door still locked and closed?
>
> [A] Now, I couldn't testify to that.
> . . .
> [Q] Right, but did you have to unlock the door to let [EMS] in? Can you think, can you remember that?
>
> [A] Humm - -

In the light of the circumstances the state court identified, Williamson fails to show that counsel was deficient for not investigating the burglary in an attempt to make a tenuous connection between that incident and Jones's shooting. Counsel was not ineffective for instead arguing that the State's wholly circumstantial case was insufficient to meet its burden of proving beyond a reasonable doubt that he was responsible for Jones's death. Williamson does not establish that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying his claim.

Williamson also alleges that the night Jones was shot, a stack of $20 bills went missing from his home, thereby supporting his theory that the burglar returned. Respondent contends that Williamson failed to exhaust this supporting allegation because he did not raise it in the corresponding ground of his postconviction motion. Williamson

---

[Q] I know it's kind of tough.

[A] Yeah, that's, - - no, I cannot tell you. . .. I might have had the door unlocked, expecting them to come. You know.

[Q] After you called them?

[A] If, when I called them I might have unlocked the door and let - - but Willie was already laying down there, you know . . .

(*Id.*, pp. 632-33.)

On the 911 call, the operator told Williamson to unlock the door and he said, "Okay. Okay. Do you know where I am?" (*Id.*, p. 325.) He did not respond when the operator reminded him to make sure that the door was unlocked. (*Id.*, pp. 325-26.)

replies that he mentioned this allegation in the documents attached to his postconviction motion, which documents were not included in the record before this Court. Even assuming that the allegation was raised in the attachments and that Williamson's presentation of the allegation satisfied the exhaustion requirement, Williamson still fails to show entitlement to relief.[7]

During the interview, Williamson was uncertain about the money. In describing his recollection that Jones fell to the ground shortly after arriving, Williamson stated that he had not yet paid Jones for the drinks. He said, "I never got a chance to pay him. That's how quick it happened. I poured the drink, went in the living room, and I had - - well, *I don't know if I still got it, may be still sitting on the table*, I had a pile of $20 bills, I never paid him." (*Id.*, pp. 626-27) (emphasis added).

This statement, made on the night of the shooting, indicates that Williamson was unsure whether money had in fact been on a table. Williamson never stated that he noticed the money was missing or that he thought someone stole it. Indeed, he maintained to police that no one else had been in the house and that he would have heard it if someone else

---

[7] The state court did not expressly address Williamson's allegation about missing money. Ordinarily, when a state court addresses some claims raised by a defendant, but not a claim that is later raised in a federal habeas proceeding, the federal habeas court presumes that the state court denied the claim on the merits. *Johnson v. Williams*, 568 U.S. 289 (2013). This presumption is rebuttable though, and de novo review of such a claim is appropriate when "the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court . . ." *Id.* at 303. Even assuming that the court did not rule on this part of Williamson's claim, he fails to show entitlement to federal habeas relief under de novo review.

entered the house and shot Jones. (*Id.*, pp. 612, 632, 634-36.) Under these circumstances, Williamson does not show that counsel was deficient for not investigating a connection to the prior burglary based on his claim about the missing money, or that he was prejudiced by counsel's performance. Williamson is not entitled to relief on Ground Three.

### D. Ground Four

Williamson argues that trial counsel was ineffective for misadvising him "with regard to the necessity of testifying on his own behalf in trial." (Doc. 1, p. 10.) He states that he could have "reasonably and innocently explained away" the State's evidence and that he could not present his defense without testifying. (*Id.*) Williamson contends that counsel misadvised him that his testimony was not necessary because the best defense was to argue that the State failed to meet its burden of proof through its circumstantial evidence.

Williamson states that he would have testified to numerous topics. Regarding his relationship with Jones, he would have testified that they were best friends, that he would not have hurt Jones and did not shoot him, that they had plans to go fishing the next day, and that he felt badly because if he had never called Jones to come to his house, Jones would not have been shot by a third party.

Concerning events prior to the shooting, Williamson would have testified that he called Jones and asked him to bring the drinks because he felt sad after an earlier visit by

his ex-wife and her son. He also would have testified that he called Jones while Jones was at Walmart and that he did not have anything to drink beforehand but Jones had already been drinking before he arrived. He would have testified that after Jones arrived, Williamson locked the door, made himself a drink, and went to the living room without Jones to watch an action movie. The movie "included loud noises with gunfire which was being played through his high-wattage stereo/speaker system." (Doc. 2-2, Ex. H, p. 31.)

Regarding his alleged lack of knowledge of the shooting, Williamson alleges that he would have testified that his bedtime is 7:00 p.m. and he would have been asleep when Jones was shot. He would have testified that he "must have fallen asleep" and then woke up believing that only a few minutes passed when saw Jones lying on the floor. (*Id.*) Williamson would have testified that he believed Jones had fallen down and had a heart attack because he saw Jones fall in the past, and the paramedic misunderstood what he said about seeing Jones fall.[8] Williamson would have testified that he was unsure about the timeline because he was "confused and dazed . . . and in shock" after finding Jones. (*Id.*, p. 32.) He would have testified that he did not hear the door open when the alleged third-party shooter entered or hear the gunshot because he was sleeping and the TV was "very loud." (*Id.*) Williamson would have testified that when the detective asked him if anyone

---

[8] Williamson appears to refer to firefighter Donald Bunch's testimony that Williamson said Jones stated he felt like was going to pass out and then fell. (Doc. 10-2, Ex. 4, p. 225.)

else had been in the house, he answered no because he did not realize that Jones had been shot and therefore had no reason to believe someone else had been present.

Regarding the evidence and his overall theory, Williamson would have testified that he did not know he stepped in blood because the house was dark, so he thought he must have hurt his toe. He would have testified that the deadbolt was unlocked when paramedics arrived. He also would have testified that he made derogatory comments about Jones due to frustration and sleep deprivation, that two Taurus Judge revolvers were recently stolen from his home, that he placed an empty shell in the Taurus because it did not have a safety, and that he left a small stack of $20 bills on his desk to pay Jones, but that neither he nor Jones had been found with any money on them.

The state court found that "[n]early all of Defendant's proposed testimony was placed before the jury through his recorded statements." (Doc. 10-3, Ex. 20, p. 11.) The state court found that the remainder of Williamson's proposed testimony was inconsistent with his statements to police or "were not mentioned at all." (*Id.*) The state court noted that on cross-examination, Williamson would have been confronted with his inconsistent statements and the State would have emphasized that some of his proposed testimony "suggest[s] his memory became clearer or that he misspoke to law enforcement the night of the shooting." (*Id.*) In addressing Williams's proposed testimony about the stolen firearms and the empty shell in the firearm, the court concluded these matters "were

33

disposed of" in Williamson's earlier claim that counsel was ineffective for not investigating the prior burglary. (*Id.*, p. 12.) The state court concluded that counsel's advice not to testify "was not deficient performance nor was it prejudicial as the majority of Defendant's assertions were already in the trial record and placed before the jury." (*Id.*)

Williamson does not show that the state court's decision was unreasonable. As the state court noted, much of Williamson's proposed testimony was presented to the jury through his statement to police. And some of his proposed testimony was inconsistent with his earlier statements or involved self-serving claims that he did not mention when he talked to police. Therefore, Williamson would have faced significant risks on cross-examination, as the state court discussed.

Williamson argues that the state court unreasonably determined that he failed to show prejudice on the basis that most of his proposed testimony was already presented to the jury through his recorded statements. (Doc. 2, p. 21.) He similarly contends that the state court unreasonably determined that his testimony was unnecessary because it would be cumulative. Williamson asserts that his testimony could not be considered cumulative because the State's case was circumstantial, his credibility was at issue, and the jury "had to determine whether his hypothesis of innocence was truly exculpatory." (*Id.*, p. 22.) Williamson argues that he could have testified to this information in a more coherent fashion and clarified any confusion about his recorded statements. (*Id.*, pp. 21-22.)

Williamson's assertion that he could have presented a more cohesive narrative is conclusory and vague. Moreover, as the state court suggested, Williamson would have risked appearing like he was changing his statements after the fact. Thus, the State could have significantly challenged his credibility on cross-examination. Further, to the extent that Williamson's proposed testimony merely reiterated other evidence, it was indeed cumulative. He cannot show that the state court's decision was unreasonable on this basis.

Williamson also argues that the state court's decision was unreasonable because the state court discounted his testimony about the two stolen Taurus firearms. (*Id.*, p. 22.) He contends that the state court "never evaluated the potentially exculpatory effect of such testimony," especially his proposed testimony that placed an empty shell in the revolver because of the lack of a half-cock safety feature. (*Id.*) However, there is no indication that Williamson mentioned this self-serving allegation at the time of the shooting. Further, this allegation does not account for the wadding found on the floor between Jones's body and the living room—the room where Williamson had been and where the gun was found. Williamson has not shown that the state court's decision involved an unreasonable application of *Strickland* or was based on an unreasonable factual determination.

Finally, Williamson has presented this Court with unexhausted supporting facts. He refers the Court to Exhibit H to his memorandum of law for a list of matters to which he would have testified at trial. Exhibit H is a photocopy of several pages of his

postconviction motion. But Williamson added several handwritten supporting facts in Exhibit H that were not included in the postconviction motion. (Doc. 2-2, Ex. H, pp. 30-34.) Thus, those facts represent an unexhausted aspect of the ineffective assistance claim. *See Weeks v. Jones*, 26 F.3d 1030, 1044 (11th Cir. 1994) (stating that "presentation of *some* ineffective instances in state court does not preserve in federal court *other or all* instances of ineffective assistance that were not presented in state court claims, when such a procedural bar exists") (emphasis in original). Since Williamson cannot return to state court to raise this part of his claim in an untimely postconviction motion, *see* Fla. R. Crim. P. 3.850(b), this part of his claim is procedurally defaulted. *See Smith*, 256 F.3d at 1138. Williamson does not establish that an exception applies to overcome the default. *See id*.

Respondent did not raise default and instead concedes exhaustion of Ground Four. Notwithstanding the default, Williamson's additional allegations do not entitle him to relief. Williamson does not that show his counsel was ineffective for allegedly misadvising him about testifying, even assuming that he told counsel this information. Numerous facts are not critical (for instance, that he went to sleep at 7:00 p.m. even while on vacation) or were already in the record (for instance, that paramedics worked on Jones for some time before realizing he had been shot, and that Williamson locked the door after Jones arrived).

Williamson also claims that Jones must have unlocked the front door for the perpetrator when the perpetrator knocked and that "a fingerprint test would have proven

36

that." (Doc. 2-2, p. 32.) But Williamson offers no evidentiary support for his assertions about the fingerprint or his theory that a burglar would have knocked on the door. Williamson does not establish that he had any personal knowledge of these matters that would have allowed him to offer the proposed testimony.

In support of his claim that he made derogatory statements about Jones and an officer when he was tired and frustrated, Williamson states he would have testified that he made the comments after he had been treated like a convicted criminal, had been forced to sit outside his house in the cold, and sat in the back seat of a locked car "having to observe people using [his] counter like a park bench." (*Id.*, p. 32.) However, even Deputy Mays agreed that Williamson's comments were made while he was tired and frustrated. (Doc. 10-2, Ex. 4, pp. 387-88.) And Deputy Mays testified that Williamson was not restrained and was free to get out of the police car when they returned to his home. (*Id.*, p. 376.)

In sum, none of Williamson's additional supporting facts establish that counsel was ineffective for advising Williamson not to testify at trial or that he was prejudiced by counsel's performance. Williamson has failed to meet either prong of *Strickland*. He is not entitled to relief on Ground Four.

## V.    CERTIFICATE OF APPEALABILITY

A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Instead, a district court or

court of appeals must first issue a certificate of appealability (COA). *Id.* "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a COA, Williamson must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Williamson has not made the requisite showing. Finally, because Williamson is not entitled to a COA, he is not entitled to appeal in forma pauperis.

It is therefore **ORDERED** that Williamson's Petition for Writ of Habeas Corpus (Doc. 1) is **DENIED**. The **CLERK** is directed to enter judgment against Williamson and in Respondent's favor and to **CLOSE** this case.

**ORDERED** in Tampa, Florida on January 27, 2023.


Kathryn Kimball Mizelle
United States District Judge